IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF OKLAHOMA

GERALD S. CRABBE, )
)
         Plaintiff, )
)
v. )   CASE NO.   CIV-13-1358-R
)
AMERICAN FIDELITY )
ASSURANCE COMPANY, )
)
         Defendant. )

## ORDER

Defendant has filed a Motion for Summary Judgment (Doc. No. 39), to which Plaintiff has responded. The Court has considered the parties' submissions and finds as follows.

Plaintiff filed this action following his termination from American Family Assurance Company ("AFA"), where he had been employed since 2001, when he was hired as a hotline technician. In October 2012, Plaintiff was serving as the team leader for the field hotline team when Defendant initiated an investigation into the actions of various employees of the team based on a complaint by Sheilah Adams.[1] AFA management made the decision to

---

[1] In October 2012, Ms. Adams was asked by her supervisor Jonathon Hinkle whether she was enjoying the new location of the Field Hotline Team within the AFA building. She responded affirmatively and indicated that when the group's work station was located in a smaller enclosed space she believed certain male members of the team used their computers to view pornographic videos and websites, which made her embarrassed and uncomfortable.

    [H]e [Gary Tripp] would ask people to come over to his cube. He'd say, 'Come here, look at this.' And it would get quiet. They'd giggle, laugh, and just make little comments, trying to be quiet about it.
    I was never invited to come down to look at whatever they were viewing. And, again, it was just one of those feelings, with everything that was going on, that that's what you thought was going on.
    When I was given the pornography cd [by GaryTripp], then I knew that just -- put it in a fact for me that it was porn that was being watched and viewed.

(continued...)

retrieve all AFA computers and external hard drives from the team for forensic evaluation to determine whether Ms. Adams' claims could be substantiated. The task of conducting the forensic examination was assigned to an external auditor, Calvin Weeks. AFA's reasons for utilizing Calvin Weeks included the large number of computers to be searched and the fact that the AFA employee that would ordinarily be involved was friendly with hotline team members.[2]

Mr. Weeks prepared a triage report with regard to certain of the computers retrieved from team members. As a result of the investigation, on November 2, 2012, Gary Tripp, an African American male on the hotline team was terminated. On January 24, 2013, James Lupton, a white male who had served as the supervisor of the hotline until December 2011, was also terminated for violation of AFA's policies.[3]

Plaintiff first met with human resources the day after Ms. Adams complained to Mr. Hinkle. He was not informed why his computer was being retrieved, but was asked about inappropriate usage thereof, which he denied. He met with Bev Wood, AFA's Assistant Vice President for Human Resources and his supervisor, Jonathan Hinkle, on January 28, 2012.

---

[1](...continued)
S. Adams, deposition p. 60.
It is undisputed that Ms. Adams did not actually see or hear any pornography, other than one time referenced in her deposition. In approximately 2008, co-worker Gary Tripp gave her a family movie to watch at home which turned out to be pornography. Ms. Adams considered it a mistake on his part and did not report it to either Mr. Tripp or management.

[2] There is evidence that the field hotline team spent time waiting for questions from AFA employees in the field and that they were permitted to use their AFA computers for limited personal usage while awaiting those calls.

[3] Mr. Lupton had a prior disciplinary action involving pornography on his AFA equipment.

2

At that time he was informed that the forensic examiner had determined that he had accessed pornographic materials on his AFA computer. Plaintiff denied the accusation and the meeting was disbanded to permit Jonathan Hinkle to consult with Calvin Weeks.

On February 8, 2013, Jonathan Hinkle demoted Plaintiff from his salaried team leader position and reassigned to the position of support center analyst.[4] The disciplinary report issued to Plaintiff by his supervisor, Jonathan Hinkle, indicated improper use of American Fidelity's electronic information resources. Shortly after his demotion, on March 15, 2013, after Jonathan Hinkle determined Plaintiff had been utilizing his cellular telephone to clock in before actually entering the building, Plaintiff was terminated. Plaintiff contends Defendant's decision to demote him and the subsequent decision to terminate his employment were both motivated by his race in violation of state and federal law. Defendant seeks summary judgment on Plaintiff's demotion and termination claims, arguing that Plaintiff cannot establish evidence of pretext with regard to the decision to demote him and that Plaintiff cannot establish either a *prima facie* case or pretext with regard to the contention that his termination was racially motivated.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as matter of law." Fed.R.Civ.P. 56(a). In making this determination, we view the facts and evidence in the light most favorable to the nonmoving party, the plaintiff. *Morris v. City of Colo. Springs*, 666 F.3d 654, 660 (10th

---

[4] On that same date David McClam, an African American male from the team, was demoted from support center specialist to support center analyst for accessing inappropriate materials.

Cir.2012).

Title VII makes it "an unlawful employment practice for an employer" to "discriminate against any individual with respect to" the "terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a).[5] The parties agree the Court should analyze Plaintiff's claims of discrimination under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applicable in cases where direct evidence of discrimination is lacking. Under this framework Plaintiff bears the initial burden to establish a *prima facie* case of discrimination. The Supreme Court recently noted that the *prima facie* case rule is not intended to be inflexible nor is it onerous. "Rather, an individual may establish a *prima facie* case by 'showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under' Title VII." *Young v. United Parcel Service, Inc.*, --- U.S. ---. 135 S.Ct. 1338, --- (2015)(quoting *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 575 (1978)).

Once Plaintiff has established a *prima face* case, the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Lobato v. N.M. Envtl. Dep't, 733 F.3d 1283, 1288* (10th Cir.2013). If Defendant makes the required showing, the burden returns to Plaintiff to show a genuine dispute about whether the

---

[5] The same standards apply to Plaintiff's federal and state law claims, and thus, although the Court specifically references Title VII herein, the analysis is equally applicable to Plaintiff's 42 U.S.C. § 1981 and state law claims under the Oklahoma Anti-discrimination Act.

proffered explanation was pretext for discrimination. *Id.* at 1289. The Court begins with the Plaintiff's claim of discrimination related to his February 8, 2013 demotion.

As noted, Defendant does not argue that Plaintiff cannot establish a *prima facie* case of racial discrimination with regard to the decision to demote him to support center analyst. Further, Defendant has articulated a legitimate non-discriminatory reason for the demotion, Plaintiff's alleged violation of AFA's Electronic Information Resources Use Policy by visiting websites that indicate pornographic content, using a MiFi to access such and taking measures to hide his use history from others.[6] Accordingly, the burden shifts to Plaintiff to present sufficient evidence of pretext, that is to offer evidence that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Simmons v. Sykes Enters., Inc.*, 647 F.3d 943, 947 (10th Cir.2011). A plaintiff demonstrates pretext by producing evidence of "such weaknesses . . . in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997) (quoting *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951–52 (3d Cir.1996)).

Plaintiff makes the following arguments in support of pretext with regard to his demotion: (1) disputes as to the decision-maker; (2) credibility issues; (3) disparate treatment; (4) shifting reasons; and (5) other circumstantial evidence. Plaintiff contends that

---

[6]In the brief in support of summary judgment Defendant contends Plaintiff was demoted for violation of the sexual harassment policy. There is no record evidence to support this basis for his demotion. Although the investigation was triggered by Ms. Adams' statements to Mr. Hinkle, there is no evidence that any finding of sexual harassment was ever made against any employee of the hotline and AFA never relied upon alleged violation of such policy before the EEOC or in the disciplinary action issued to Plaintiff.

even if any of these categories is not sufficient to establish pretext that considered in conjunction with one another he has established that genuine issues of material fact remain for resolution at trial regarding Defendant's motivation for his demotion. Plaintiff argues Defendant attempts in its motion to isolate Jonathan Hinkle from the decision-making process. In its motion Defendant asserts that when Jonathan Hinkle and Bev Wood met with Plaintiff on January 28, 2013 to discuss his alleged violation of AFA policy that they intended only to reprimand Plaintiff and place him on probation for his violation of company policies, and that Jonathan Hinkle was not involved in that particular disciplinary decision, but made aware of it before the meeting.[7] In support of his argument Plaintiff relies on the deposition testimony of Jonathan Hinkle: "[f]rom what we could see, Gary Tripp was the focal point of that activity, and the other two [David McClam and Gerald Crabbe] were involved but not the pushers or aggravators or aggressors, if you will, of that activity. And so we talked about different options." Jonathan Hinkle deposition, pp. 58-59. "Yes, I don't recall who made it or if it was a combination of efforts. But, yes, a document was drafted to provide to Gerald Crabbe [at the January 28 2013 meeting]." *Id.* at p. 63. This is contrary to Bev Wood's testimony that Mr. Hinkle was informed of the decision to place Plaintiff on probation but only involved in decisions made after the January 28, 2013 meeting. The testimony by Mr. Hinkle raises an issue of whether he was involved in the initial decision of

---

[7] Jonathan Hinkle served as Plaintiff's supervisor from March 2012 until Plaintiff's termination in March 2014. He is alleged to have stated to another AFA employee during this time period that his experience with black employees is that they were lazy, as will be discussed subsequently herein. Thus, it would support Plaintiff's theory of pretext if Mr. Hinkle was shown to be involved in the decision to discipline the African American hotline employees while AFA was denying his involvement.

how to discipline Plaintiff, and certainly there is no dispute that after January 28, 2013 he was much more closely involved.

Plaintiff also argues that Defendant has attempted to isolate Mr. Hinkle from the decision to terminate his African American colleague, Gary Tripp, which occurred very shortly after Ms. Adams raised the issue of pornography in October 2012. There is testimony, including from Mr. Hinkle, that he was not involved in the decision to terminate Mr. Tripp. Plaintiff relies on the contrary testimony of Kim Fisher, the Chief Information Officer for Defendant. Ms. Fisher testified extensively in her deposition that she was receiving information from Jonathan Hinkle and that Mr. Hinkle was involved in the decision to terminate Mr. Tripp. After the lunch break of her deposition, Ms. Fisher attempted to retract all of her testimony regarding Mr. Hinkle's involvement, indicating that Ms. Wood informed her that she had testified incorrectly. Although a jury could find that Ms. Fisher's recollection regarding Mr. Hinkle and his involvement in Mr. Tripp's termination was merely an error, the Court cannot make this credibility determination, and the inconsistency supports Plaintiff's theory that Defendant's legitimate non-discriminatory reason is pretext for discrimination. *See Beard v. Seagate Technology, Inc.*, 145 F.3d 1159, 1170, n. 7 (10th Cir. 1998).

Plaintiff also cites disparate treatment as a basis for the Court to find genuine issues of material fact regarding pretext. Plaintiff contends that the investigation into the alleged improprieties with Defendant's equipment did not treat employees equally on the basis of race, because African American employees' machines were the ones for which Defendant

7

ordered reports and the computers of certain white employees were not retrieved, including Jonathan Hinkle, Traci Tabyanan, who held Jonathan Hinkle's job for a few months before he was transferred to that position. Also, Eddie Jetton did not have his computers retrieved and was not interviewed although Sheilah Adams indicated he had once used a flash drive containing pornography on his AFA computer.

The failure to conduct a fair investigation can raise an inference of pretext. *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 542 (10th Cir.2014). The Court finds that a jury could find that the evidence establishes that the investigation conducted by Defendant was less than fair. First, Defendant's employees are unable to accurately convey which of its supervisory employees were involved in which decisions. Second, it appears that the only white employee for whom a formal report was requested from Calvin Weeks was James Lupton, who was no longer an employee of the hot line but had a prior discipline for accessing pornography. Although AFA sent the computers of Dave Divelbliss and Sheilah Adams to Mr. Weeks, they did not request written reports or apparently a key word search for the terms that were used to search the computers of the African American members of the hotline team, Gary Tripp, David McClam and Plaintiff.[8]

---

[8] The Court disagrees with Plaintiff that other evidence he cites is probative of pretext. The "adult hit list" provided by Plaintiff does not contain sufficient information to permit the Court to draw any inferences from either its creation or its content. Additionally, Plaintiff's contention that Mr. Divelbliss and Ms. Adams show inappropriate content in their histories is of limited utility where it is undisputed that Mr. Weeks informed AFA that his review of their computers revealed they were consistent with what he would expect to find in an employee who used the computer in the manner described by AFA for a hotline employee. Although Plaintiff can complain of the process of the investigation, he cannot complain that Defendant did not correctly utilize the results of the search of Mr. Divelbliss's and Ms. Adams's computers, because Mr. Weeks provided no substantive information to indication violation of any policy.

(continued...)

Additionally, there are disputes regarding whether Jonathan Hinkle permitted Plaintiff to review the initial report provided by Mr. Weeks in an effort to clarify or discredit any portion thereof.[9] Jonathan Hinkle at some point met with Dave McClam after Mr. McClam was informed he was going to be placed on permanent probation.[10] Mr. Hinkle permitted Mr. McClam to view the information provided by Calvin Weeks. According to Mr. McClam that meeting resulted in him identifying certain elements of the Weeks' report as faulty with regard to information he allegedly accessed with his work computers, but there is no indication in AFA's records that it took note of the errors.[11] Mr. Hinkle testified that he offered the same opportunity to Plaintiff. Mr. Crabbe, however, avers he was not given the

---

[8](...continued)

[9] After the meeting between Plaintiff, Jonathan Hinkle and Bev Woods in January 2013, Jonathan Hinkle indicates that he wanted to confirm certain information with Calvin Weeks. Thereafter he met with Mr. Weeks and indicates that Mr. Weeks explained certain aspects of his report to Mr. Hinkle. This initial report was apparently contained on a cd provided by Mr. Weeks. The Court has not received a copy of the cd or a copy of its exact contents. Defendant relies upon a June 27, 2013 report issued by Mr. Weeks which details his conclusions regarding Mr. Crabbe's machine. Included therein are pages indicating a report of October 26, 2012, also listing of certain findings. Those portions of the June report that were not provided to Defendant prior to Plaintiff's demotion are obviously of limited utility, because it was issued subsequently thereto.

[10] Probation was later replaced with reduction in pay.

[11] They were, however, aware, as indicated by an email from Bev Wood to Kim Fisher on January 28, 2013, stating:
> Please be sure if we have any other ISD security incidents that we sit down with the manager to review the report back on forensics. I should have done that with Jonathan, so our conversations and preparations would have been complete. Just as Diana did, Jonathan was quickly able to review information and find some support for what Gerald and David said.

Plaintiff's Ex. 178.

9

chance to explain or refute any information in the report.[12] A jury could discredit Mr. Hinkle's testimony that he permitted Plaintiff to review the information from Calvin Weeks, and in doing so, could conclude that Mr. Hinkle did not honestly believe that Plaintiff had engaged in the misconduct and thus did not want to offer Plaintiff the opportunity to refute the allegations when he imposed the discipline. *See Rivera v. City and Cnty. of Denver*, 365 F.3d 912, 924-25 (10th Cir.2004).

Plaintiff next argues that Defendant's proffer of different reasons for Plaintiff's demotion is evidence of pretext. Prior to this litigation Defendant had not relied upon Plaintiff's alleged lies at the January 28, 2013 meeting as a basis for explaining Plaintiff's demotion. Rather, the disciplinary action issued to Plaintiff on February 8, 2013 alleged he had violated AFA's Electronic Information Resources Use Policy by visiting websites that indicate pornographic content, using a MiFi to access such and taking measures to hide his use history from others. Jonathan Hinkle testified, however, that he did not want Plaintiff in a management position because he had lied by denying that he had accessed the inappropriate materials, an explanation not contained in the February 8, 2013 memorandum. Additionally, Defendant also now seeks to rely on Plaintiff's alleged violation of the sexual harassment policy, although there is no record that any violation was substantiated.

Finally, Plaintiff relies on "other circumstantial evidence" to establish pretext, including an alleged racially-biased statement allegedly made by Mr. Hinkle to Scott Griffith

---

[12] According to Bev Wood, Mr. Hinkle offered Plaintiff the opportunity to view the Weeks' report but he declined.

during their tenure at AFA.

> Shortly after Jonathan Hinkle took over as supervisor of the hotline team, he came to me at my desk in Information Security and specifically asked me about how I felt each African American member of the team was performing their job. . . . He stated he was worried about the African American team members' work ethic. . . . Mr. Hinkle told me he had different a (sic) experience with black people, and that his experience with black people is that they are lazy."

Griffin, ¶ 2. In his deposition Griffin offered testimony contrary to portions of his affidavit. He persisted, however, in his testimony that Jonathan Hinkle stated "my experience with black people is that they're lazy." Griffith, Depo., p. 241.

Defendant attempts to avoid this statement by arguing that it was a stray remark, not evidence of pretext. The Court disagrees under the circumstances of this case. Although isolated racial comments do not establish pretext, this comments can be tied to the employment action in dispute. *See Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1184 (10th Cir. 2006)(citations omitted). The comment was allegedly made by the person who initiated the decision to demote Plaintiff when the original course of action had called for him to be placed on permanent probation.[13] The above evidence, taken together, convinces the Court that genuine issues of material fact remain with regard to the issue of pretext, and therefore Defendant is not entitled to summary judgment on Plaintiff's federal or state claims

---

[13] Although the decision was characterized as being a group decision, according to Bev Wood, "Jonathan Hinkle, after having reviewed the forensic information, came to discuss with me that he did not feel he could keep Mr. Crabbe in a position of leadership because he was dishonest." Wood deposition, p. 340-41.

stemming from Plaintiff's demotion.[14]

The Court next considers Plaintiff's March 15, 2013 termination. With regard to Plaintiff's termination Defendant argues that Plaintiff cannot establish a *prima facie* case of discrimination because he was not performing satisfactorily, in that he was not reporting for work in a timely manner and was clocking in remotely before arriving to the hotline area at AFA.

Generally a plaintiff must demonstrate the following for a *prima facie* case: "(1) he was a member of a protected class; (2) he was qualified and satisfactorily performing his job; and (3) he was terminated under circumstances giving rise to an inference of discrimination." *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir.2008) ((quoting *Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th Cir.2004)). Defendant contends Plaintiff cannot prevail because he cannot establish the satisfactory performance element. As noted by Plaintiff, however, this conflates the Court's analysis of the *prima facie* case requirement with the legitimate non-discriminatory reason, which is improper. From Plaintiff's perspective, he has presented evidence that he was performing adequately, and Defendant has presented evidence of why it terminated him, that is for falsifying time records

---

[14] The Court notes that although Plaintiff has successfully avoided summary judgment that certain evidence he relied upon is not probative of pretext. Comparison of the racial composition of Defendant's workforce to the racial demographics of the Oklahoma City area is by itself not probative. *Trent v. Cessna Aircraft Co.*, 1995 WL 101323 (D.Kan. Jan. 20, 1995). Statistical evidence regarding the changing composition of AFA or the field hotline team is similarly not probative. Although statistics can be helpful and relevant in a disparate treatment case, *see Beck v. Quicktrip Corp.*, 708 F.2d 532, 534 (10th Cir.1983), a mere allegation, standing alone, does not raise a genuine issue of material fact as to pretext. Here Plaintiff points to evidence that certain supervisory personnel have not hired African American employees, but there is no evidence regarding how many African Americans applied for positions at the company or in the ISD. *See Hamilton v. Oklahoma City University*, 563 Fed.Appx. 597, 607 (10th Cir. 2014).

by clocking in remotely. Thus, the issue with regard to Plaintiff's termination is the same as the issue regarding his demotion, whether Plaintiff has established that genuine issues of material fact remain with regard to pretext.

In support of pretext with regard to his termination Plaintiff argues that he was only trained with regard to clocking in on February 8, 2013 and did not start actually doing so until February 27, only two weeks before he was terminated. Plaintiff complains Jonathan Hinkle cross-referenced his login time with his building access times, which he had not done before for employees, and that he did not investigate whether the access system times were in sync with the login system. He also complains that Jonathan Hinkle did not ask him for any explanation or permit him to make any explanation with regard to the issue and that he did not report the issue to internal audit as required where fraud was suspected, in accordance with Policy No. 2-05 Fraudulent, Dishonest, or Unethical Activities of Colleagues.[15] Plaintiff contends that other employees in his group were not disciplined for errors in their time cards, including Sheilah Adams, who he contends would clock in remotely before arriving at work.[16] Plaintiff also contends Defendant submitted false information to the Oklahoma Employment Security Commission by indicating that Plaintiff had been clocking in with the

---

[15] The policy provides in part:
> All such incidents must be reported to Internal Audit regardless of the opinion of the Manager as to the validity of the information. No person is authorized to waive the provisions of this procedure and no manager can resolve the incident without consulting Internal Audit.

[16] The Court finds this evidence of little value. Plaintiff testified that he had to fix his subordinates time when they forgot to clock in or out, not that he ever found that an employee had clocked in before arriving to work. With regard to his allegations against Sheilah Adams, accepting as true that she told Plaintiff she had done that, he testified that he did not share that information with anyone in management at AFA.

13

system for six months, when in reality it was only for two weeks.

The Court finds again that Plaintiff has established that genuine issues of material fact exist with regard to the issue of pretext, and therefore, summary judgment is inappropriate. In support of this finding the Court relies again in part on Jonathan Hinkle's alleged racist statement and the fact that he was the primary decision maker with regard to Plaintiff's termination. In addition, Defendant made a false statement to the OESC regarding the circumstances of Plaintiff's usage of the system, and although the statement may have been mere error, the Court can not limit itself to this single inference. Jonathan Hinkle also did not refer the matter to the internal audit division, and while Defendant will be permitted to explain at trial why such reference may have been unnecessary, the Court concludes at this juncture that the failure supports a finding of pretext. Finally, Defendant now offers additional evidence in support of Plaintiff's termination, including an incident when Jonathan Hinkle inquired whether Plaintiff had been on time, Plaintiff retorted, "well, were you on time today." This incident, which could be described as an incident of insubordination, was not one of the reasons given to either EEOC or OESC.[17]

---

[17] The Court acknowledges the existence of the policy entitled "Timesheet Management," which provides:
> A **COLLEAGUE** in a nonexempt position must be ready to work when they punch in and stop working when they punch out. . . . Punching in prior to being ready to work (i.e., while driving to work) . . . will result in corrective action up to and including termination.

Defendant's Ex. 8. However, Plaintiff denied having seen the policy prior to his deposition, In his deposition Plaintiff testified that an employee could be ready for work prior to reaching their desk if they were stopped by someone on their way to their desk. Crabbe deposition, p. 90-91. Although Plaintiff admitted "that while working for AFA, on multiple occasions, you clocked in before entering AFA's office building," Request for Admission, No. 13, the question is whether from the perspective of the Defendant at the time of his termination it had a good faith belief that he was engaging in fraud, not whether he later admitted such.

For the reasons set forth herein, Defendant's Motion for Summary Judgment is DENIED.

IT IS SO ORDERED this 30th day of April, 2015.

_____
DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE